ORIGINAL

FILED
JUL 31 2008
U.S. COURT OF FEDERAL CLAIMS

**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**

A.A.B JOINT VENTURE )
P.O. Box 37 )
Rosh Ha'Aiyn )
68100 Israel, )
)
Plaintiff, )
) No. 08-552 C
v. )
)
UNITED STATES OF AMERICA )
)
Defendant. )
)

**COMPLAINT**

COMES NOW, Plaintiff A.A.B Joint Venture, by its undersigned attorneys, and for its complaint against Defendant the United States of America, seeks monetary damages and other relief on its claim, and for grounds therefor states as follows:

## I. THE PARTIES

1. Plaintiff A.A.B Joint Venture ("Contractor" or "Joint Venture") is a joint venture of co-venturers ABB Susa, Inc., A. Arenson, Ltd. and Baran Group. Under the Joint Venture Agreement the parties are equal equity partners, ABB Susa, Inc. is managing partner. The Joint Venture was formed to bid on, and perform, a contract with the United States of America, which contract is the subject of this action.

2. Defendant the United States of America (the "Government") was a party to the contract at issue, acting by and through the United States Army Engineer Corps-Europe ("USACE"), located in Wiesbaden, Germany.

## II. JURISDICTION

3. This suit seeks *de novo* review of the Contracting Officer's "deemed denial" of a claim by the Joint Venture relating to, *inter alia*, differing site conditions. This Court has jurisdiction over this action pursuant to § 10(a) of the Contract Disputes Act of 1978 (41 U.S.C. § 609(a)) ("CDA") and 28 U.S.C. § 1491.

## III. FACTS COMMON TO ALL COUNTS

4. The project consists of the design and construction of a storage and logistics base complex for use by the Israeli Defense Force ("IDF"), which was a party to the solicitation requirements. The project is known as the Nachshonim Military Storage Base located near Elad, approximately 20 km east of Tel Aviv, Israel (the "Project"). USACE is the owner and administrator of the project until completion. The base complex consists of approximately 200 buildings, 119 of which are Dry Storage Buildings ("DSBs") specifically designed to house heavy military equipment in a ready state within a controlled climate, minimizing environmental impacts from temperature and humidity. The DSBs as built consist generally of a concrete sub-structure and walls set upon drilled/cast piles, a structural steel roof (conventional or space-type frame) and outer insulated paneling. The remaining buildings are conventional structures used for logistics, office space, and public and auxiliary use necessary for the operation of the base. The base occupies a circular area of approximately 1,600,000 square meters, or approximately 400 acres, with the buildings located in a radial pattern around two ring roads and ten radial roads, dividing the area into ten segments and one central area. Heavy earthwork, site preparation and the implementation of communications and control systems were included in the scope of the project. Design work by the Contractor was limited to the buildings and the communications and control systems. USACE provided the design, drawings and specifications

for the site infrastructure and development. The Contractor design for the buildings had to be coordinated with the overall site design and was also governed by a conceptual design based on the requirements of the solicitation's General and Special Specifications that included certain testing and performance specifications.

5. Contractor submitted its proposal and bid for the project on April 9, 2001.

6. On June 5, 2001 Contractor was awarded Contract No. DACA90-01-C-0043 (the "Contract") for $124,089,176. The performance period was stipulated as three years (1,095 calendar days) after the June 19, 2001 Notice to Proceed, establishing an original completion date of June 18, 2004.

7. The Request for Proposals included, in Division 5, a detailed, government prepared and provided Geotechnical Report. Attached to and made a part of the Geotechnical Report was a Site Investigation (Geological) Survey of the project site, prepared by Amos Israeli, dated February 22, 2000, which contained logs of test borings and photographs of the cores recovered during test borings. Ten test borings of the Project site were initially contemplated for the Geotechnical Report, but only seven test borings could be performed because of the lack of available access. The test borings were made to a depth of between ten and fifteen meters. Considerable information about the properties of the subsurface materials was also collected from a quarry area north of the Project site. The Geotechnical Report described the rock in most of the building area as "limy dolomite rock, mostly massive and hard," and the upper few meters of the rock as cracked with zones of weathered weak rock. The Geotechnical Report stated that clay penetrations may be found in the upper two to three meters of rock and that the strength and integrity of the rock mass increase with depth. A formation of coarse conglomerate and nari was noted, and was described as composed of stone fragments connected by carbonatic material. The

Geotechnical Report described a crust of clay and boulders about two meters thick in the lower zones around Mazor stream. The Geotechnical Report concluded: (1) most of the area could be excavated in hard limestone and dolomite, and that areas of weathered rock below three meters would be small; (2) the excavated rock could be used, after crushing, as backfill material; (3) it would be possible to produce stable excavated slopes with no need of retaining walls, depending on the excavation technique and precision; (4) the rock is hard and solid, enabling the construction of a portion of the buildings on flat foundations; and (5) in fill zones excavation could be performed in a controlled manner to ensure stability of building slabs, development areas and roads.

8. The Geotechnical Report contained extensive directions and recommendations for construction: (1) excavation shall be performed by mechanical tools and explosives; (2) foundations deeper than two meters should be based on a spread footing foundation; and (3) buildings designed on fill or places of shallow excavation should be founded on rock-socketed piles, i.e., drilled and cast-in-place. The report recommended spread footings and pile design, and recommended which buildings should be constructed on footings and which buildings should be supported by piles. It provided maximum vertical permitted loads for the piles and set design requirements for the allowable friction for piles, stating that any pile not complying with the "requirements of this chapter must be rejected."

9. The government prepared Geological Survey, or Site Investigation Survey, contained several salient conclusions: (1) hard to medium limestone and dolomite rocks, partly weathered, were present in almost the entire area; (2) the structure and composition of the rock mass would allow for steep excavations; (3) in some hilltops and dispersed locations there might be weakening factors which could only be detected during excavation; (4) the rocky substrate

constitutes a suitable foundation for the planned buildings and roads; (5) most of the excavated material would be highly suitable for backfill and most of it may be crushed for subgrades; and (6) during the initial road building stage of construction, the contractor should try to determine the thickness and composition of the clayey cover.

10. Amendment No. 3 to the RFP responded to geotechnical questions raised by bidders. USACE responded in many cases by referring the bidders to the Geotechnical Report. For example, USACE told the bidders: (1) to design foundations in accordance with the Contract documents, "including the Geotechnical Report in Division 5;" and (2) that "subgrade and excavation requirements *are well defined* in the Geotechnical Report." [emphasis added]

11. The government prepared and provided specifications contained numerous references to the Geotechnical Report including, without limitation: (1) "The foundation design of the DSB [Dry Storage Building] shall be according to the soil report…" Div. 02. Sec. 003, B.2; (2) "When foundation on natural hard rock is not possible, drilled piles shall be used for the foundations, *in accordance with the soil report*" [emphasis added] Div. 02, Sec. 003, B.2; (3) For the logistics buildings "the pile shall be executed *according to the directives of the attached Soil Investigation Report*" [emphasis added] Div. 02, Sec. 004, B.3; (4) "The [office and public] Buildings shall be set (sic)on bore piles *in accordance with the soil report.* The piles shall be executed *according to the directives in the soil report*" [emphasis added]Div. 02, Sec. 005-01, B.6; (5) "Design of the foundation [for the Kitchen and Dining Room Building] *shall be based* on the survey carried out by the soil engineer" [emphasis added] Div.02, Sec. 005-11, B.4; (6) Beams running under the concrete walls or bore piles for Auxiliary Buildings were to be designed and installed "*according to the location of the building* in the drawings and also *according to the requirements of the soil engineering report*" [emphasis added] Div. 02, Sec. 006-01.B.1; (7) Beams running

under the concrete walls or bore piles for the Electricity Supply Building were to be designed and installed "*according to the location of the building in the drawings and the soil report*" [emphasis added] Div. 02, Sec. 006-02, B.1; (8) the type of foundation for Mixed Use Storage Buildings were to be designed and installed "*according to the instructions of the soil investigation report*" [emphasis added] Div. 02, Sec. 006-04, 05, 06, B.1; (9) the foundation for the Vehicle Parking Shed shall be based on bore piles, "as shown in the structural drawing and described in the soil investigation report" Div. 02, Sec. 006-07, B.1; and (10) the type of foundation for the Recruitment Facility Building General Storage Building Type GS, Chemical Storage Building and Ammunition Storage Buildings shall be designed and constructed "*according to the recommendations of the soil investigation report*" [emphasis added] Div.02, Sec. 006-03, 08, 09, 011, B.1.

12. The JV based its bid in reasonable reliance upon the Geotechnical Report. In particular the Contractor relied on the Geotechnical Report to calculate its costs for earthwork and structure foundations. Since the Project site had been a shooting range for the IDF and was not accessible, the Contractor had no opportunity to perform any subsurface investigation other than to attend the January 17, 2001 prebid site visit, when only a cursory inspection was allowed.

13. For the pile foundation work, the Contractor's bid assumed that the final design would require approximately 75% of the number of piles specified in the Request for Proposal, based on three assumptions: (1) the Contractor intended to delete the diagonal or "raker" pile by designing walls bearing no lateral loads and the earth surrounding the buildings was then reinforced; (2) building loads would be carried by the pile's skin friction area and strong rock; very little load is carried by weak materials; and (3) reduction of piles reduced the redundancy of penetrating weak materials to reach sound rock, therefore reducing the length of piles. Based on

the Geotechnical Report, the Contractor also based its bid on the use of both pile foundations and footing foundations, and planned to follow the requirements of the RFP that there would be a "minimum penetration through rock" of three meters. Geotechnical Report Paragraph 7.2.3.2.

14. For earthwork operations the Contractor again reasonably based its bid on the government prepared and provided Geotechnical Report which indicated that the contractor could expect mostly hard rock, with a lesser amount of medium hard rock, even less of weak weathered rock and only traces of clay. During the bid process bidders were directed by the Government to nearby existing quarries for comparison of similar subsurface conditions. This also reasonably led the Contractor to believe that the excess materials would be of a quality that would be produced from a quarry. The Contractor reduced its overall bid price in justified and reasonable anticipation that it would realize additional net revenue from offsite disposal and sale of excess excavated materials.

15. The Contractor divided the earthwork between two subcontractors. Biri Barashi, Land Works, Development Infrastructure and Road, Ltd. "Barashi") was to perform the earthworks in the southwest section of the site (part of segment 10, segments 11, 67, 78, 89, 91 and Road 17) and Rolider, Ltd. ("Rolider") was to perform the work in the northeast section of the site (part of segment 10, segments 12, 23, 34, 45, 56 and Ammunition Bunkers). The scope of work for both contractors included drilling, blasting, excavation, processing material for fill and fill placement. The Contractor remained responsible for offsite disposal of excess material.

16. To better understand the subsurface conditions and how they could affect the foundations, the Contractor performed exploratory borings in early January 2002 in three sections. The borings showed an unexpected large variance to attain the Government prepared and provided Geotechnical Report's requirement for piles to penetrate an accumulated depth of 3

meters into rock, which varied for 5.5 to 13 meters without reaching this parameter of 3 meters of rock. Geotechnical Report Paragraphs 7.2.3.2 and 10.2.1.5.

17. One week later, on January 22, 2002, the Contractor gave written notice to the Government of this differing site condition, noting that the subsurface conditions encountered differed materially from those indicated in the Contract (Type I) and differed materially from those ordinarily encountered and generally recognized as inhering in work of the character provided for in the Contract (Type II). The notice described how these conditions would adversely affect the work: (a) Excavated material may not contain enough rock to process quantities of required fill, thereby requiring import from other sources; (b) Additional excavation/fill and construction equipment would be required to attain an adequate subgrade and foundation for structural stability; (c) Slopes on excavations would have to be flattened due to poor material, thereby increasing excavation and sub-base (subgrade fill) quantities; (d) Foundation designs would require additional pile number, length, diameter, reinforcement and a more cumbersome installation procedure and associated geotechnical oversight; (e) Additions to and revisions of the Owner-furnished infrastructure design will be required; (f) Additional design will be required to check, confirm and recommend work procedures to establish stability of pile/pile cap/floor foundation systems; (g) Excess excavated material does not have a commercial value before and/or after processing, and additional costs are and will be incurred to transport and dispose of this material offsite; (h) Additional physical and design investigations, including consultancy, will be required to evaluate subsurface conditions locally at each building site and over the entire project site; and (i) The Project Baseline Schedule will be impacted to accomplish additional design, revised logic and additional time for project completion.

18. The actual excavation for foundations, including the borings for the foundation micropiles, showed that the subsurface geology was extremely heterogeneous, comprised of a variety of material, including a large quantity of clay and very little hard rock, a circumstance which differed materially from the subsurface conditions described in the Geotechnical Report.

19. The Contractor's records, including records of a full time geologist, established six separate classifications for the actual subsurface materials encountered: (1) fat clay; (2) clay with rock fragments; (3) weak rock; (4) medium rock; (5) medium hard rock; and (6) hard rock.

20. The actual subsurface materials encountered had an unexpectedly high clay content which meant that the materials had to be separated and removed for spoil.

21. After excavation to grade, much of the unexpectedly large quantity of shallow layers and pockets of expansive clay required removal, disposal and replacement with Quarry Material Class "A" which increased the thickness of subgrade layers beneath the floors that were to be cast on grade, in some cases doubling or tripling the layers of subgrade. In addition, due to the unanticipated heterogeneity of the material, each building foundation had to be individually evaluated and determinations made of which subgrade material under the structures could be used for floor and foundation support, and which required replacement with suitable subgrade material.

22. As a result of the large and unanticipated amount of shallow layers and pockets of expansive clay contractor incurred unexpected additional costs.

23. Commencing on January 22, 2002, the Contractor notified the Government in writing of the existence of the differing site conditions and thereafter the Contractor provided additional notification and information to the Government, in which it provided detailed support for its

position that it had encountered differing site conditions and for the cost impact resulting from said conditions.

24. By letters dated July 29, 2003 and August 11, 2003 the Contractor submitted its cost proposal and request for equitable adjustment for the unanticipated costs of sub-base replacement incurred because of the effect of the differing site conditions encountered on the site. Plaintiff notes that all references to "sub-base" in these letters are incorrect and are corrected herein to refer to "subgrade."

25. Unsuitable material (significant unanticipated quantities of expansive clay) was also encountered under some roads and slopes. The government issued Change Orders P00046 and P00047 to compensate the contractor for the cost of replacing the unsuitable subgrade material, the content of which contained significantly more clay than represented in the geotechnical report, for subgrade replacement for these roads and slopes.

26. However, while the government agreed to compensate the contractor for subgrade replacement under some roads and slopes it refused to compensate the joint venture for the replacement of unsuitable subgrade material under structures.

27. On or about December 20, 2004 plaintiff filed its First Amended Complaint in Case No. 04-1719C.

28. In paragraph 37 of the First Amended Complaint plaintiff asserted that it was entitled to recovery in the amount of $412,239 for replacement of subgrade material under many of the structures, since the subgrade material was not as represented in the Geotechnical Report. The subgrade replacement claim was included in the First Amended Complaint since Plaintiff believed it was based on the same underlying operative facts set forth in that Complaint; namely

that the actual subsurface material differed materially from the conditions represented in the Geotechnical Report.

29. The subgrade replacement claim was before this Court from on or about December 20, 2004 through January 26, 2007. During this time both parties were free to conduct any necessary discovery with respect to the claim.

30. On January 26, 2007 the Court issued an Opinion granting Defendant's Motion to Dismiss and holding that the contractor's claim for subgrade replacement costs was a new claim which did not arise from the same set of operative facts as the claim submitted to the contracting officer, and therefore the court lacked jurisdiction over the claim.

31. Thereafter, contractor submitted the following subgrade replacement claims by separate letters dated March 28, 2008 to the contracting officer;

(a) Segment 23 - $63,487;

(b) Segment 34 - $90,832;

(c) Segment 45 - $32,103;

(d) Segment 56 - $41,109;

(e) Segment 67 - $29,934

32. Under the Contract Disputes Act the Contracting Officer was required to issue a decision with respect to each of these claims within 60 days.

33. As of this date, the Government has failed to issue a Contracting Officer's final decision. In accordance with the Contract Disputes Act, the Contractor considers the Government's failure to issue a final decision a "deemed denial", entitling the Contractor to file the subject complaint.

34. The Government impliedly warranted the accuracy of the Geotechnical Report.

35. The Contractor reasonably relied upon the Geotechnical Report in developing its proposal price for the Contract.

36. The Geotechnical Report provided by the Government was deficient in several material aspects, as described above.

37. Due to the above described conditions the subgrade material under many of the structures could not be used for foundation support and had to be replaced with suitable subgrade material.

38. The replacement of this unsuitable material under the structures was a differing site condition for which the joint venture is entitled to an equitable adjustment.

39. The contractual basis for the Contractor's claim is FAR 52.236-2, Differing Site Conditions, FAR 52.236-3, Site Investigation and Conditions Affecting the Work, FAR 52.233-1, Disputes and FAR 52.243-4, Changes.

40. In Segments 23, 34, 45, 56 and 67 the Contractor encountered subsurface or latent physical conditions at the site (large unanticipated quantities of expansive clay material) which differed materially from those indicated in the contract, or the presence of unknown physical conditions at the site of an unusual nature which differed materially from those ordinarily encountered and generally recognized as inhering in work of the character provided for in the contract, which entitles the contractor to an equitable adjustment pursuant to FAR 52.236-2, Differing Site Conditions, for all additional costs incurred as a result of said differing site conditions in the amount of $257,465.

WHEREFORE, A. A. B Joint Venture, by counsel, respectfully requests this Honorable Court grant judgment in favor of A.A.B Joint Venture against Defendant the United States of America as follows:

(a) Monetary relief in the amount of $257,465;

(b) Statutory interest under the Contract Disputes Act; and

(c) Such other and further relief as the Court deems proper.

Date: July 31, 2008

Respectfully submitted,

Brian Cohen
BELL, BOYD & LLOYD, PLLC
1615 L Street, NW
Suite 1200
Washington, D.C. 20036
(202) 466-6300

(202) 835-4117 Fax
Attorney for Appellant

Of Counsel:

Philip C. Jones, Esq.
BELL, BOYD & LLOYD, PLLC
1615 L Street, NW, Suite 1200
Washington, D.C. 20036
(202) 466-6300